May it please the Court, I'm Lindsay Powell for the Secretary of Health and Human Services. I'll be sharing time 2010 with counsel for the California Department of Health Care Services. And with the Court's permission, I'd like to reserve five of my 20 minutes for rebuttal. All right, that's complicated, but I'm sure you can do the math. Thank you. The plan approvals at issue are the product of an extensive back and forth between CMS, the State, and interested providers. Following the enactment of Assembly Bill 97, which introduced the payment rate reduction at issue, CMS sent to California in June 2011 a letter setting forth its interpretation of Section 30A as a statute with substantive concerns and suggesting the types of data that California could provide to demonstrate compliance with that substantive requirement. And that initiated an extensive back and forth. California responded with voluminous data. Does California provide cost data on each of the matters challenged in this appeal? No, Your Honor, there is cost data with respect to certain services, including pharmacy and skilled nursing services, but not with respect to all. So you really do need us to do something about orthopedic hospitals? Yes, Your Honor, and I see no impediment to doing that. The federal government was not involved in orthopedic hospitals. There had been no federal agency approval of the state action there. Here we have both an extensive record. The government may, although it wasn't involved, it's still circuit law, so we have to address it somehow. Yes, Your Honor, but it's circuit law not binding where there is a federal agency. I guess one question would be if you get some kind of deference, whether it's Chevron or Skidmore or Skidmore minus, or even if you get no deference, we'd be in the arbitrary and capricious category. If you take a position that's directly contrary to orthopedic, why wouldn't that potentially be arbitrary and capricious if that's a judicial interpretation of what's actually required by the statute? The problem is that even though there's no race judicata against the federal government, it's still circuit law. Well, Your Honor, I think the Supreme Court made clear in Brand X how the sort of order of operations works in these circumstances, and what the court said there is where a circuit had previously construed a statutory provision without saying that the construction adopted was compelled by the unambiguous terms of the statute, that a subsequent agency interpretation. So you're saying that what we should do is limit orthopedic hospital to where the secretary has not interpreted the statute. Here the secretary has interpreted the statute, so the Chevron deference trumps the rule in orthopedic hospital. Your Honor, I think that's right. As long as, just to be clear, going forward, it wouldn't be the case that there would be a separate understanding of Section 38 governing different types of suits to the extent different types of suits are cognizable. I didn't understand what you just said, I guess because I was thinking of the question I asked. Right, no, and I was just trying to clarify the question, making sure that you hadn't meant something else, but if my last answer was confusing, then you did that. I couldn't understand it. Could you address my question? You understand, everybody on the Court reads the decisions we write. Everybody on the Court is going to wonder, gee, how come they didn't follow orthopedic hospital? And I'm inviting you to orally write a rough draft of the paragraph of the decision that answers that question. Thank you, Your Honor. So, Brand X is entirely clear where we have the sequence of events here, a court decision, considering the statute without purporting to state that the statute unambiguously requires that interpretation. Yeah, that's exactly what Brand X says, but that's what Judge Fletcher said at orthopedic. I mean, if you read the language, the language is, we conclude that the director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals. Down there it says, to do this, the department must rely on responsible cost studies. Over and over and again, the department cannot set rates consistent with efficiency and economy in the healthcare system without considering the cost to the hospital. Costs are an integral part of the consideration. So, it seems to me that we have authoritatively construed 38 as requiring consideration of costs, whether that's good or whether that's smart or not. I know the Secretary says it's not smart, it's wrong, but it seems that we're stuck with what is an authoritative construction of the statute. Are we not? Nothing in orthopedic hospitals suggests that that's the result unambiguously required by the statute. Unambiguously, but if you read this fairly, costs are an integral part. They must do this. It doesn't work without it. Why doesn't that foreclose your position in this case? You're bound by orthopedic hospital unless and until it's somehow overturned on bank. You know, a panel can't mess with it on bank, but on bank, the court might reconsider it. So, under Brand X, Your Honor, I don't think that language is clear enough. I just can't figure out what you're saying. Are you saying that Brand X overruled orthopedic hospital sub salientio? Are you saying that we should distinguish orthopedic hospital because, in that case, the Secretary had not construed and, in this case, the Secretary has construed? Are you saying that we should, as a panel, call for en banc to review orthopedic hospital? I can't figure out what you're saying. I'm saying orthopedic hospital, and the interpretation adopted in that case, is not binding on this panel for the reasons stated in Brand X. What you're saying is what I think Judge Fletcher said there, which is, in looking at a state agency interpreting the law, that there's no deference given. And then they cite Chevron and say, of course, in that case, there would be. But then, so all is well. Even with Brand X, you'd be fine. But then, at the end of that little paragraph, the opinion says, what concerns us is whether the state law and regulations are consistent with federal law. We don't defer to the state. So you're now saying, if I get it right, that under Brand X, even though the Ninth Circuit has interpreted the statute, once the federal government comes in, old ballgame over, new ballgame. That's exactly what Brand X says, Your Honor. That is correct. Unless, of course, in the court's initial interpretation, it has said that the statute can only mean this one thing. And that's what orthopedics seems to say, the conclusion. The proper interpretation of 30A's requirement that payments for services be et cetera, et cetera, requires the department to consider the costs of providing hospital outpatient services. Why doesn't that also satisfy Brand X that says when a court has authoritatively construed a statute, the secretary is blocked? Brand X says that, too.  There's a difference between an authoritative construction and one that purports to identify the only thing that the statute could mean. And so I think the requires language and the must language that Your Honor is citing in orthopedic is stating an understanding of what follows from the court's interpretation in that case, but isn't purporting to state that that's the only thing that the statute could mean. This court has, in many cases, recognized that Section 30A- Requires the department to consider? Must? Yes, Your Honor, and that is what- Where's the out on that? Well, so I'm not being clear about the- If you read that, it says, and if they don't, you're not following the statute because you can't do what you're supposed to do. See, why I got hung up on this case is I don't think this case really involves the construction or the interpretation of 30A. To me, there's nothing in 30A that's either ambiguous or vague. It creates a mission. It doesn't talk about methodology at all. And so what orthopedic may be distinguished along is it's talking about, well, we don't like your answer. We don't like your methodology. And that does survive Brandex. I mean, Brandex gets rid of that. You don't have to worry about orthopedic. And a lot of the other cases, the other circuits say the statute is clear. It calls for a result but has nothing to do with methodology, and then that is what the secretary has to figure out based on the secretary's expertise. Right. So the question, as Your Honor suggested, is whether Section 30A requires specific results, giving the state some CMS flexibility in terms of how they determine whether those results are satisfied, or whether, as the court did suggest in orthopedic hospital, it looks to and requires a specific methodology. You're saying we're the experts and we say it doesn't require a cost. Sometimes it might, but it doesn't automatically require a cost. That's exactly right. Everybody would be out of some misery if the department would just adopt the regulations one way or the other. To me, this all seems a little bizarre. We have a whole set of cases in mediation which are state and a series of health care providers or various combinations of things. Now we have this case with, I think, four different groups that are here in front of us. You've argued that these prospective regulations are maybe another, we ought to give some credit to them. I don't understand the legal basis for that. But wouldn't we be in a completely different posture if the department would just, up in one way, adopt or not adopt an interpretation? Yes, Your Honor, that would certainly help clarify things. And the department is... What explains the delay? What's happened to the formal rulemaking process? Was there anything outside or within the rulemaking process that you can share legally and tell us what's going on? Why are we waiting and waiting? Only in the most general terms, but it is, as the notice of proposed rulemaking itself reflects, this is an area where there's no consensus about what types of methodology. So I have what seems bizarre to me that we would jump in and say, okay, we give you deference, and indirectly today you say costs don't need to be considered. We look instead about availability of services. And if it's so unclear, what if it happens tomorrow or six months from now, and the department says, you know, this is such a mess, we really can't come to that interpretation. You're saying first the verdict, then the trial on rulemaking. No, Your Honor, the thing that has always been clear, and CMS has consistently taken this view, is that Section 30A requires a substantive result. So it's access proved by whatever means. But you're telling us that the rulemaking may come out differently. I can't figure out what to defer to. It seems to me that what I'm deferring to, I guess there's a litigation position. And that's the weakest deference. I don't know if that would overcome orthopedic hospital. Certainly if there were a reg, I think we'd defer. And even if they change the reg, we'd defer again. I think there's a Supreme Court decision that says that we defer again, even if it's in the opposite direction. But when you've got a notice of a proposed rule, what that is, is an invitation to everybody who separately or jointly can afford a lobbyist to urge changes in the rule. And they most certainly will. So I don't know what to defer to because the notice of a proposed rule doesn't seem substantive. Your Honor, we're not seeking deference to the notice of proposed rulemaking. What do we defer to then?  Which decision? The letter? The approval decision, yes. So what we should do is defer to the letter of approval. Which reflects the Secretary's longstanding interpretation. Wait a minute. I don't want to know the argument for why yet. Right now I just want to know precisely what is it that we should defer to. Is it the letter of approval of California's reduction period? It's the letter as read, I think, in context of the broader record in this case. But, yes, the agency action under review is the approval determination. Keep qualifying your statement. But we're going to have to come out with something that's clear rather than incomprehensible. Do we defer to the letter or do we defer to the letter, the something, and the something? You defer to the agency's decision in this case as reflected most directly in the letter, but also corroborated by the certified records supporting that decision. So I think the letter is clear enough that it stands on its own. You don't defer to evidence when you grant Chevron deference. You defer to an agency's interpretation of the statute that it's charged with administering when the statute itself leaves to the agency either explicitly or by reason of ambiguity the interpretation. Yes, Your Honor, and that interpretation is expressed throughout the record in addition to the letter. The record is what's driving me crazy. So I'm going to point you specifically to June. Because you can't defer to the whole record. That means we make an evidentiary judgment on the record about what's fair or something like that. It's meaningless. In the June 2011 letter, which CMS sent to California at the outset of this process, it very clearly set forth its interpretation that Section 30A is confirmed with a substantive result, as relevant to this case, that results in silence. We defer to the letter, period. All we have to do is decide whether the letter gets Chevron deference, and that distinguishes the case from orthopedic hospital. Whether the interpretation reflected in the agency's decision. And was there any comparable agency determination in orthopedic hospital? No, Your Honor. There was not. What about in the Alaska case, the Alaska Department of Health, where instead of approving, they disapproved, and the rationale was that costs weren't provided. So how do you square that with what you just told us, that the longstanding position of the Secretary has been costs aren't required? Choosing, Your Honor, first, the Alaska case was highly relevant on the deference question. There the court did give Chevron deference to an exercise of precisely the same delegated authority being exercised here. It's true that in that case it was a disapproval decision, rather than approval decision. But the authority comes from the same font of delegated authority, and it would make no sense to give different degrees of deference to an agency decision, depending on whether the answer is yes or no. But what was it about Alaska's position that the Secretary didn't like? It was the absence of cost studies. No, Your Honor, that's a misrepresentation. I'm sorry, I'm misrepresenting. Sorry, by plaintiff, the misrepresentation of the Secretary's position in that case. That is what plaintiffs say in their brief. But if you look at the Secretary's brief, what, in fact, she said in that case was that there was no data whatsoever provided by the state to support the very substantial payment rate increases. And the Secretary's position was that data was required to support the proposed amendment to show consistency with the substantive requirements of the statute. What was the data? So the Secretary said, and I can – I mean, I know what it would be as a practical matter. The cost is higher in Alaska because there are hardly any roads and you have to fly around 2,000 miles to go to the dentist. The Secretary in that case very clearly said, first, the government has not required the state to submit cost data. That can't be any clearer. There was no position taken in the Secretary's brief there or otherwise in the case that cost data is required by the statute. What the Secretary went on to say is that it had found – the agency had found that the state had shown no justification for departure from the existing rates and suggested that a showing of higher costs might be a way to justify an increased rate. So to be clear, where the Secretary has taken a position on Section 30A, she has consistently said that it has to do with substantive outcomes and that those outcomes, consistency with those requirements, can be shown in a variety of ways. In some cases, it may be that cost data will be a reasonable way of showing compliance, but the Secretary has never understood it to be required. And to return to some earlier – Back to the Alaska case, you said that it wouldn't make sense. I mean, there it basically says we've got this statute and we give deference to the Secretary. That's the Ninth Circuit. So it seems to me that if orthopedic poses a problem over here, Alaska may pose a problem for the other side. We've got these competing bookends. But one of the arguments made is that, well, in the disapproval, you have a lot more process that one goes through once you get disapproved than you do on the approval. Will you comment on whether you think that factors into the deference issue? Yes, Your Honor. It does not for at least two reasons. First, Meade was very clear about in his statement that formal procedures are not necessary to support a conclusion that deference is appropriate. There may be evidence in some cases that an agency is exercising the type of authority that deserves deference, but the touchstone is what type of authority is the agency exercising. And when there's been an express delegation of authority to fill gaps in the statute to implement it, that ends the inquiry. So where it's clear that there's been that type of delegation, there's no more that you need to do. So why didn't you step up and say, Alaska, case over? I think – But you didn't say that. And your brief doesn't really say that. Well, I think we absolutely rely on Alaska and think that that's enough to end the inquiry. But the district court rejected Alaska based on the greater procedural requirements put there. Don't we review de novo on that legal question? Yes, but we – So what do we care what the district court thought? Your Honor, we only wanted to make secondary arguments in the event that this court, likewise, didn't think it sufficient. But absolutely, this court's decision in Alaska determining that when the secretary is exercising – Your answer to the question I started out with, what do we do about orthopedic hospital, your answer to it is follow Alaska. And Alaska has Judge Fletcher as one of the three judges. He agreed in Alaska, and he wrote orthopedic hospital. It bookends the issue, and it means that once the agency has made a decision, you've got something to defer to. When it hasn't, you don't. And the letter is of agency determination. Is that it? Yes, Your Honor. I know every time I ask you this, I get a whole lot of qualification and justification and argument, which make me think I must be misunderstanding it. I must be wrong. No, Your Honor. The answer that I was trying to give before and am giving now is that the agency's decision in this case, and the interpretation expressed therein, is entitled to deference per Alaska, and that under Brand X resolves the difficulty of orthopedic hospital. But you don't need Brand X, I mean, if you've got Alaska. I mean, that's where I'm having some trouble, that the department has this fairly convoluted thing, and listen to this and the record and this, and it's just blindfolded. And I'm just sitting here looking at Alaska versus the Centers for Medicare and wondering, do we have any discretion to do anything different? Alaska does require deference in this case. The logic of that decision, its conclusion that Congress was authorizing the Secretary to speak authoritatively and in construing the Medicaid statute as she has done here, is dispositive of the deference question. Let me get the posture of the case. There's injunctions issued, right? So the cuts are not taking place. That's correct. They've been stayed. So why shouldn't we just sit tight and see what the Secretary does? Your Honor, I don't. Why not? I mean, why should we have the court having to plow through all this to figure out deference or no deference when at least the baseline to that is in the Secretary's hands and for whatever reason the Secretary hasn't acted. They're not having to pay a share in any of the reductions and status quo, and it's in your hands. Your Honor, the Secretary is not required to promulgate regulations. It's a perfectly reasonable method, as this Court said in Alaska, to construe the statute through case-by-case adjudication as by using approval decisions. No, they're not required to, but apparently there's some burning issue going on out there where we might divine by looking at the number of lawsuits and looking at the series of legislation in California. So the Secretary put this out for notice and comment. That period's closed. We are now about a year past that. That's true, Your Honor, but given that the Secretary isn't required to promulgate regulations. I know, but, you know, sometimes we, within the confines of the law, try to look at the practicalities of what's going on here. We're not really in an academic exercise. We're in something that affects health care providers, potentially beneficiaries of services. Resolving the issue in this case, Your Honor, would achieve the same effect. Giving deference to the Secretary's authoritative interpretation of Section 30A as focusing on substantive results and not requiring cost data would resolve the issue for purposes of all the litigation. You haven't really answered my question, but I guess it means that you don't think that there's any practical result. If we wait, you want an answer. Yes, Your Honor, and what I was trying to respond to was your concerns about, you know, unending litigation, that a decision on this issue by the court would, I think, achieve the same effect for that purpose. Well, then maybe I would say, you know, Mr. and Mrs. Secretary, a decision out of the office as to the regulations would provide a baseline for this court to make such a decision. Yes, Your Honor, and I will, and I acknowledge it would be very helpful, but the Secretary has expressed her interpretation through the agency decision now under review, and I would urge the court to reach a decision on it. Doesn't Alaska confirm orthopedic hospital? No, Your Honor. Well, it says, moreover, the relevant language of 30A remains unchanged since orthopedic hospital unless our interpretation of its purpose and the state's obligations there under still holds. The question wasn't presented anew in that case. It wasn't briefed that way by the party, so I don't think the court was asked to make the same determination, but even were that the case? You know, usually when we read these decisions to figure out what the law is that we're bound by, we don't read the briefs that were submitted. Yes, Your Honor, but it's... That was a case involving costs, and Judge Fletcher was on the panel, and he said orthopedic still holds. Yes, Your Honor, but what we have here is that for the first time in court, an agency decision authoritatively interpreting Section 30A not to require cost studies. Per Alaska, that interpretation is entitled to deference. Only if it's not arbitrary, capricious, or otherwise contrary to the law. Yes, Your Honor, the Chevron framework still applies, but that substantive understanding of Section 30A isn't entirely reasonable. What really worries me in some measure is, you know, okay, we have all this deference and all this stuff is going on, and then if you read, for example, this amicus brief, there's an avalanche of information that's before us. I don't know whether this is part of the record or not, about the deleterious effect of all of these cuts in California, pushing it to the bottom of the list of Medicaid reimbursements, and, you know, article after article after article saying doctors are bailing out, this isn't enough to get specialists. Are you worried at all about this? Is the Secretary worried about all of this stuff, or just ignore it? The Secretary absolutely doesn't ignore such studies, and considered all of the evidence submitted by plaintiffs in this case, that's why we have such large records. But looking at all of the evidence presented and the very detailed market studies provided by the State of California, the Secretary reasonably concluded that with respect to the service areas now at issue, that the rate reductions would not have the deleterious effect. It's pretty clear that one of the problems is that doctors simply aren't stepping up to the plate anymore because they say that they can't afford it. That's not borne out by the data that California submitted. The access analysis submitted with respect to physician and clinic studies paints a different picture. And I would note that through this rigorous process, California did identify a number of services where they're looking at the data. There was some concern about prospective access, and California withdrew the plan amendments with respect to those services. You have only four minutes left. It looks to me as though it was important. In Alaska Health, what the decision says on page 937, that when the agency disapproved, it explained in its disapproval that the rates that it suggested were based on an analysis of statewide costs. And while it might consider a request for a higher rate if supported by data showing costs that were not considered by IHS in setting the published rates, Alaska provided no such data. It looks as though that's how it is reconciled, at least internally, with Orthopedic Hospital, which is why I asked you at the beginning, was there any kind of cost data presented on each of the matters at issue before us? There is cost data with respect to a number of the services, but not all. Not all. But the Secretary's authoritative position is that cost data is not required. When you say authoritative, does the letter of determination say that cost data is not required under 30A, or does only the proposed rule state that cost data is not required under 30A? The letter says that the Secretary found the following data sufficient, so by clear implication. Well, by implication. It's quite clear. And then in the June 2011. By implication, and we should treat that as clear. And then in the June 2011 letter, which is part of the record, was part of. Does the letter say that, as the letter did in Alaska, that the determination reflects consideration of costs? The June 2011 letter that I was referring to says. I'm trying to find it. What number is that? So within the managed pharmacy care excerpt of the record, if you look at 149. But if you have a different volume than managed pharmacy care, depending on what the title is, I can give you a different page number. Okay. But what it says is that CMS does not interpret Section 30A of the Act to require cost studies in order to demonstrate compliance. We believe the appropriate focus is on access, the substantive focus. And is that letter attached to each of the individual plaintiffs here? Yes. It's in the record for, I believe, each of the. Yes. And actually, I have the record plate for each of those, if you would like them. Yes. So managed pharmacy care 149, California Medical Association 138, California Hospital Association 117, and California Medical Transportation Association 50. All right. Thank you. Good morning, Your Honors. May it please the Court. I'm Karen Schwartz, Supervising Deputy Attorney General, on behalf of Toby Douglas, the Director of the Department of Health Care Services. I'm planning to address the no cause of action issue, the failure to satisfy the irreparable injury standard, and the cross-appeal. However, before I do that, I'd like to very briefly, if I can, address two questions that were raised by the panel. First, should we wait until the Secretary issues guidelines? There's, I think, a fundamental misconception in plaintiff's papers regarding what the nature of the Medicaid program is and the cooperative federalism that underlies it. Some of the provisions in the Medicaid Act are not drafted in terms of ministerial objective standards and duties, but contain broad and diffuse standards. This is one of them. If you will, it's the second prong under Gonzaga. It establishes policy considerations that we need to consider in our rates, but it doesn't specify, for example, that rates have to bear a relationship to cost, as the Bourne Amendment before it did, that Congress repealed. This provision was drafted by Congress specifically to be broad and diffuse. Justice Breyer, in his majority opinion in Independent Living, cited precisely that fact in explaining why it was so important that this really be an issue addressed, now that there's plan approval in that case, by the Secretary. Because standards that are drafted in broad and diffuse terms are not susceptible to judicial enforcement. They are intended to give the state flexibility to experiment at the state level and to come up with different kinds of solutions to the local problems. And to the extent that there are issues of interpretation, they are more appropriately handled by the administrative agency rather than by the court. And Justice Breyer said that in his concurrence in Gonzaga, that this is the nature of certain kinds of spending clause provisions, and he said it again in the majority opinion in Douglas. And so that's the answer to your question. This was drafted purposely broad and diffuse to give us discretion as a state to address issues. And beyond that, and so there is no need for hamstring us with specific requirements of costs and so forth, that Congress itself didn't put in there. I completely agree with you were it not for orthopedic hospitals, that seems to say 30A mandates, requires, must. You put in the word the consideration of costs. And you just anticipated, Your Honor, my next point, which is yes, orthopedic announced what it saw as a definitive objective standard. But several things happened after orthopedic. And this court is not bound by orthopedic. And my panel might be. So are you saying that orthopedic has been overruled by subsequent authority? No, I'm not. Limited or what? I'm saying that under Brand X, orthopedic is no longer binding. And the reason for that is because, and I want to address this point that was briefly discussed, 30A is not. When you say no longer binding, do you mean it should be distinguished, it's not binding in this case, or do you mean that Brand X implicitly overrules orthopedic? I mean that subsequent panels and subsequent courts that consider orthopedic are not bound by it. If it was just the state and there was no federal government, no federal interpretation, wouldn't we be bound by orthopedic? Absolutely not. You know, I asked you if orthopedic was overruled. And you answered in different words. And I couldn't tell the distinction between the words you used and the word that I used, implicitly overruled. But there must be a distinction. It must be wrong in the way I phrased it or you wouldn't have used different words. So that means I'm missing something. Yeah, and I don't want to get – I understand words are important, but I believe this is a situation where semantics shouldn't hijack substance. And what I mean by that – Well, that's just a play on words, semantics hijacking substance. A court can overrule another court. I am not comfortable using the word – Look, the Supreme Court can overrule this court. Exactly. And under Miller v. GAMI, if the Supreme Court makes a decision which implies that a previous decision of this court is wrong, we don't have to follow it. And I'm trying to figure out whether you're saying that that's this situation. But I can't get an answer. Yeah, and I'm trying to give you an answer. And let me put it this way. I'm uncomfortable saying that the agency can overrule orthopedic. But what Grant X says is that the subsequent decision of the agency binds unless certain conditions which are not present here are met. And so Grant X is – you can say it's an implied overruling of any prior circuit decision when certain conditions are met. I disagree with you 100%. I want to go back to my question. Yeah. If the state, like it is in these other cases, is in there without the federal government, are you saying you're not bound by orthopedic? Well, that's going to go to my next question, which is the state can't – We're not bound by orthopedic if HHS has subsequent to orthopedic interpreted the statute in discharge of its congressionally delegated duties to implement the Medicaid Act, which is exactly what occurred here. And on this point, I want to point out Justice Breyer addressed this very issue. There are instructions to this court in the majority opinion. I'm sorry. I've been living with – I agree with you pretty much. Thank you, Your Honor. I've been living with these issues in these cases for many years, and I have to admit to being a little hard-self about them. But I will slow it down. Justice Breyer specifically notes that once the federal government has interpreted 30A, pursuant to its obligations under the Medicaid Act to do so, that that interpretation is subject to deference. So you have that development post-orthopedic. And the other development is Sanchez. You have the Ninth Circuit's decision in Sanchez saying this statute, 38, is vague and ambiguous. It is not susceptible to judicial enforcement. And so that is a recognition that this is not a statute that can be construed only one way. And therefore, under Brand X, the HHS interpretation trumps, and that's the only outcome that's consistent with cooperative federalism and congressional intent that 30A, which contains this broad and diffuse language, be enforced administratively. Now, I'd like to move on to the no cause of action issue. You know, Brand X, to me, is very clear. Brand X says that a court's prior construction of a statute here at 30A trumps an agency construction otherwise entitled to Chevron deference only if the prior court holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. And as was previously argued, you're saying that, well, orthopedic doesn't do that. Orthopedic quibbles with the method of getting to the result. So Brand X says, hey, not a problem. Now, orthopedic could not possibly be construed as having come up with the only possible interpretation. That's the point. So Brand X doesn't overrule it. It just simply says that. HHS trumps it. And let me just throw in one. They trump it if it's not arbitrary interpretation. That's right. Then you go to Chevron. And the other point I'd like to make is every other circuit to consider the issue of whether cost studies are required has rejected it. I thought that was only D.C. because the other ones, I looked at that, and that got my attention. So I went back and looked at those cases. HHS wasn't a party in those cases, and they weren't Chevron deference cases. No, that's correct. In this case, naturally. How can you say every other circuit to consider the issue? Your Honor, I would be happy to submit a 28-J letter because this is a brief, an issue that I actually briefed in the Supreme Court. Many courts have considered orthopedic D.C. as not the only one to reject it. And my only point isn't don't follow those circuits. No, follow HHS. But they couldn't have rejected it because that was before. My point is that other courts have interpreted 38 differently and rejected the Ninth Circuit's interpretation. And under those circumstances, you can't say that this is the only possible interpretation. We actually have cases that say that, that just because some other court says something different doesn't mean that they're right. I understand. I mean, we actually have cases that say exactly the opposite of what you just said. No, I don't believe you do, but this is a response to Judge Kleinfeld's point, which is what do we tell our sister panel? And what you say, among other things, I would respectfully submit is 38 is not susceptible to only one interpretation. It doesn't even mention cost studies. And SAMHSA has recognized the broad and diffuse language, and other courts have interpreted this differently, and so it's susceptible to multiple interpretations, so we go to brand X. Under brand X, if we find that the Secretary's decision is reasonable under Chevron, we defer to it. That's what I submit to you. I have a question. Your time is up, so let me just get right – forget the cause of action. Let's just assume – I shouldn't even be here, Your Honor. That's really the point. Don't interrupt the judgment, Your Honor. No, go away. No, I don't want to go away. Well, I mean, you know, if you want to just keep saying what you want to say, there's no reason to talk to us, okay? So my question is this. If there's no – if we were to affirm the injunction, then would we need to address the Douglass issue? Absolutely. I'm glad you asked that question. If we were to reverse the injunction, would – you would still have the claim made by the plaintiffs, but would it fall out as moot, or what would happen to it if it were reversed? Okay. Did you want me to answer if it's affirmed, or should I do both? Before it's affirmed, you go and you see what they tried to say in Douglass, right? Right. If it's affirmed, there's still the fact that we're not a proper party. What I meant by I shouldn't even be here is just that the state is not a proper party in these proceedings. I'm happy to be here arguing the case and to answer all your questions. As to – so the court should still address whether the state's a proper party and, therefore, whether it can be enjoined. It really has to do that if we're going to maintain the voluntary nature of the spending clause program, because what plaintiffs can get in an APA action is all they can get. They can get a determination that if they were to prevail, that the 8097 isn't consistent with federal law. And that puts the state on notice that if you implement anyway, you could lose federal funds. They want something more. They want to compel us to exercise our choice that we have in a program of cooperative federalism in a way that they prefer, that we should not enforce 8097 and we should take the federal money. And that might be the right decision. And, frankly, it's the decision we would make. We've already said we would make that decision. But that's our choice. You can't take the cooperative and the federalism out of cooperative federalism. And so the additional action against the state can accomplish no good. It does accomplish a rather bad – What principle knocks out the supremacy clause? What principle? There are – Is it moot? Is it preempted? What's the principle? I'm afraid I don't understand your question. Well, you're saying they're stuck with the APA, right? Right. Okay. The issue is – The supremacy clause and all that other stuff is out because of the APA? No. The supremacy clause cannot be used to accomplish what plaintiffs are trying to accomplish. Why not? For many reasons. Number one, the supremacy clause doesn't create a right of action. It simply establishes a rule of law. If you're before the court, we know which one wins. Okay, number one. What's number two? Number two is that even if the supremacy clause could create a cause of action, it cannot do so contrary to congressional intent. Preemption is about enforcing statutes pursuant to congressional intent. Congress did not want – So what preempts the supremacy clause approach? What preempts the – You just said preemption. You just said preemption. What preempts the supremacy clause approach? I'm not sure I understand that. But preemption is just a shorthand I'm using for a supremacy clause cause of action. So I'm afraid I don't understand the court's question. Well, something usually preempts something else. There is no supremacy clause cause of action because the supremacy clause doesn't create a cause of action. And plaintiffs basically acknowledge that and they say, oh, well, I mean, I think your argument makes a whole lot of sense, but we're bound by independent living. I don't believe you're bound by independent living. Why would the Supreme Court vacate nine different decisions of this court? They haven't vacated independent living. Because it wasn't before then. They couldn't. So it's binding law on us. I don't believe so because there's been an intervening event, which is an extraordinarily unusual event. What's the intervening event? That the Supreme Court granted cert on an interlocutory basis. Cert grant is not an intervening event. And then decided and vacated nine decisions. It couldn't. But is there any doubt it would have had that case before? No. And so under your own courts. There's always doubt until they write the opinion. No, there isn't. The issue wasn't before then because that was an earlier decision in the same case. But the later cases all rely on independent living. The very case going to the embanked court so that to the extent one might need to navigate and overrule and distinguish and whatever, Alaska, independent living, and orthopedic, let the embanked court do that. Two things, Your Honor. Number one, we now have SPA approval in this case. And that's a distinguishing factor. SPA approval? Yes. Sorry. State plan amendments. Massage and hot tub. Yeah. Which is what I hope to do. Which is what we might need after looking at all these records. But the Supreme Court itself recognized that that was an intervening factor that was significant enough to require revenge of both cases to this court. I submit to you this is the opportunity for this court to answer the question posed by the Supreme Court in the first instance. Okay. Let me ask you this question, which is a way of setting something up. When we got this case, I saw these other cases and what had happened, you know, that I'll come back. So I called up some of the other judges on the other panels, and I said, What's going on with this mediation? And they said, We have no idea. The parties have taken it into mediation. Are you in mediation on those cases? And you're supposedly waiting for us? No. Okay. So are you trying to work this out? So why shouldn't we wait until you work it all out? No. We're not mediating these cases. What are you mediating? We're mediating the 85 and the 8011 entry cases. And what's important for the panel to understand is those cases are largely moot because the reductions at issue in those cases terminated on June 1 of 2011. So you're mediating something that's moot? They claim they have retroactive damages. We claim they don't. But the point is the statute at issue in those cases are no longer in effect. Well, if you're willing to mediate that, are you willing to mediate this? We're not willing to mediate this. We need a warrant. These lawsuits are grinding the state to a halt. We're losing $50 million. I don't think that's the reason the state's coming to a halt. There's a lot of other reasons. Nor does it matter to how we can decide the case. We can't decide the case and say, well, the law's impractical. Congressional intent, Your Honor. Congress's intent, and this is ripped through the legislative history of 30A, and it's also in the repeal of the Board of Minutes, was that the state should have flexibility in how they implement the Medicaid Act. We follow the words of the statute. All of that. And these lawsuits are hamstringing us again. It's tough. We follow the words of the statutes as construed by cases we're bound to follow. See, one thing you understand is we're a panel. We're not the court. Yes. And so if we've got authoritative decisions that we think are standing in the way of what you think is the right answer, we can't take that step unless we go through the en banc court. I respect that. I believe that the question is open to you. I believe the question is open to you because of a bunch of intervening circumstances, because of grand acts, and because the last time I tried that, the rest of the court said wrong. But I respect that if you know your colleagues, you know your court. Last time I tried that, which is recently, the court said wrong. We're going to take it en banc. So if the answer is that this is an issue that needs to be addressed en banc, then we accept that. We don't think that you need to. You don't think, but some of our colleagues might. Understood. Understood. All right. Thank you. Thank you. Let's sit here and be happy with you. Good afternoon. Good morning, Your Honors. It seems like it's almost afternoon. Craig Canizo for the California Medical Association et al. Counsel, there are a lot of side issues that I'm not sure we're going to have to resolve. My problem with your position in the case is you do have a secretary's letter of determination. Whatever data there was, was apparently good enough for the secretary. In Alaska, we said good enough for the secretary, we defer to it. And that would suggest a distinction between Alaska living in orthopedic hospital, where the secretary has made a distinction. We could read orthopedic hospital to mean that you need cost studies where the secretary has not made a determination, but no one has to show us cost studies that the secretary has because presumably the secretary obtained or conducted whatever studies were necessary. What's the matter with that reasoning? The reason I think that reasoning is incomplete, Your Honor, is that under the Administrative Procedures Act, this court is still bound to consider whether the trial court committed an abuse of discretion in concluding that apart from cost studies, the secretary's decision could not stand based on the arbitrary and capricious standard of review. Why would it be arbitrary and capricious?  Why would her decision be arbitrary and capricious? Because she failed to meet the standard as that arbitrary and capricious has been interpreted in numerous cases in this court and the Supreme Court to consider the relevant factors of access and quality. Why didn't we presume that she followed the law? That's the normal presumption. She told you in the letter that access was actually critical. But it's still the role of this court, excuse me, the trial court in the first instance, and then subject to a deferential standard of review at the Court of Appeals to determine whether that action was arbitrary and capricious. The thing about the arbitrary and capricious standard is you present a lot of argument and evidence to the secretary. You present argument and evidence to the State of California. You present everything you want in the administrative record. And then the secretary makes a decision. You can't re-litigate it from scratch. I agree, Your Honor. You can't re-litigate it from scratch, but you do need to determine whether the evidence supports the decision. And that is the standard APA review. No, no, we don't. We just decide whether in light of the record taken as a whole, the decision was arbitrary and capricious. That's an amazingly deferential standard. Think about it for a second. It is. Arbitrary, think about what that means. Capricious, think about what that means. And just last August this court. And the courts, excuse me, if you wait until I finish, I'll be able to understand your answer to my question. Okay. And the courts have said, starting in Chevron on down, the Supreme Court has said, we don't know what we're doing. Judges, stay the hell out of this because this is a special area that's been delegated precisely to the secretary to make these decisions. There's no methodology in the statute at all. There's a goal, here's what you're supposed to accomplish, and there's no methodology at all. And so you're quibbling with the methodology. And, you know, the secretary said it's sometimes helpful, sometimes necessary, but not always. And that seems to me, under pharmaceutical research versus Thompson, entitled to the kind of deference that we've been told to apply to the secretary. Well, Your Honor, we don't believe that decision is correct, as we suggested to the district court, because it was an incomplete analysis, pharmaceutical research, the D.C. Circuit, because it was an incomplete analysis of the need factors, especially in light of this court's recent en banc decision in Price just last month. Counsel, if we look at how the decision was made, it seems to me that it's not arbitrary and capricious, even though there are plausible arguments against it, because the secretary can focus on availability rather than costs quite reasonably. The reason is that in medical care, costs are highly negotiable. Insurance companies negotiate with hospitals and pharmaceutical companies for what the charges will be. A hospital purchasing equipment negotiates with the equipment manufacturing company. If they sell a certain number of them, they may get a kickback or a further reduction. They get a lower price than the market price of another hospital. The insurance companies negotiate for who's going to be a preferred provider. The costs are not a constant. They're all negotiable. So the secretary could quite reasonably decide, contrary to what we decided in Orthopedic Hospital, that the way to look at it is to look at what the statute says, availability of care to the general population, rather than what are costs under the current charges that the pharmaceutical companies and doctors and whatnot charge to provide the services. I don't see why that would be arbitrary and capricious, even though it's debatable. If this were a formal rulemaking challenge to a rule by the secretary that did express that reasoning, explained why they came to that conclusion, I would agree. It would be a deferential standard, and Chevron would probably apply to a review of the rulemaking. Why do you need a rulemaking? Why can't you just make individualized determinations? Because under Mead, those individualized determinations are not necessarily within the Chevron pale. Except pharmacy. This is a single theory. It's not like 29 or however many, 187,000 different decisions in customs offices. Congress expressly delegated the power to the secretary to decide these SPAs. That's quite different than some of the other cases. They said, okay, here's the goal. You do it. They do the same thing to the treasury? And she's done it. So, yeah, I mean, the rulemaking is nice, but I don't think the rulemaking is necessary where Congress has said, this is your job. It's administrative law 101. You do it. Let's speak to Brand X. She's done it. Because you've really joined the issue, what does Brand X stand for? Brand X stands for the proposition that if the agency goes through, as it did in that instance, a two-year formal rulemaking and explains its results and justifies the answers, the court will give deference to that decision. I have trouble with this idea that we could only defer to that. It seems to me there are only 50 states. It's not that many individualized decisions. And what's more, they differ. For example, in California, there are roads that go from every place to every place else. In Alaska, there aren't. So in Alaska, if somebody in King Cove wants to go to the dentist, it's a 2,000-mile plane trip. They may have an abscessed tooth and really have to go to the dentist. In California, you don't need to fly 2,000 miles to go to the dentist. So a decision is likely to be different if it's well-informed for Alaska and California. And it's very hard to make one rule that's not a procrustean bet. So it seems to me that it's not arbitrary and capricious to decide state by state. I agree with that, Your Honor. But the district court in this instance did find that on the issues of access that you said could be paramount that there was an insufficient evidentiary record to support the secretary's approval of the assessment of access for the patients. There was no evidence that the patients enjoyed equal access to care in California, which is the standard even under the secretary's interpretation. She also concluded that quality was not considered, which orthopedic establishes and other cases have established as an independent ground. So that independent determination of access by the trial court based on the record should be deferred to. No, we don't defer to the trial court at all here. On factual issues? No. If we're looking at this under the APA, we're looking. One, we try to determine is there any difference. Even if there's no Chevron or Meade, Skidmore, we still would be looking at whether the decision was arbitrary and capricious under the APA. And in some ways it all collapses. So in making that determination, the trial court's not really making factual findings. The trial court is looking at the record. That's correct. And so we're looking at the same record. That record demonstrates that California is at the bottom of all expenditures by Medicaid for beneficiaries. Somebody has to be at the bottom. California is one of the higher cost states, Your Honor, and it's in aberration with their other payment rates. For example, Medicare. Then we get into a trial. This is the difficulty. We don't often get really clear statements in a case where something is pending like this, but if you look at the Douglas case and you look at what the majority had to say about, you know, this basically presents a kind of legal question that ordinarily calls for APA review. And it goes on to say the Medicaid Act commits to the agency the power to administer the federal program, and here the agency has acted. This decision carries weight. After all, it's comparatively expert, et cetera, et cetera. The court is quite clear, leaving aside the whole supremacy issue, because I think that's kind of a red herring in looking at the overall case. The court is pretty clear in its direction there. And our role is to determine whether something is arbitrary and capricious. So you have to point that the focus has been primarily in the briefing on are costs required, are costs not required. It seems to me that really takes us off point as to what we ought to be looking at. Why is that the focal point? I'm not suggesting it's the focal point. It was just an independent grounds for affirmance of the district court. I want to speak to the issue of cost. Your suggestion of waiting for the rulemaking is not only practical, it's legally required in our view. And it's required by two things. One, I cannot read Brand X as supporting the secretary's position that all actions of administrative agencies can trump definitive court of appeal interpretation. That's what it says. It says it trumps it if it's a construction of unambiguous terms. Then the secretary is stuck. If it's not a construction of unambiguous terms, then the secretary can trump it. That's what Brand X says. Brand X was a subject of a formal rulemaking. I read it five times. It says that you get blocked out by the authoritative construction by a court based on the unambiguous terms. Orthopedic Hospital didn't construe unambiguous terms. It says we don't think you can do it without costs. That's quibbling with the secretary. I would respectfully suggest, Your Honor, that this is not an authoritative interpretation. The letter that they referred to that you have the citations to, it doesn't have a signature to it. We don't know from which official it was obtained. It is the most unofficial private type of decision-making by the agency that price the court. I thought it was an official approval of California's proposal. It is. The approval letter is a subsequent letter, Your Honor, that just says it is approved. The citations you were given are to an earlier letter about four months earlier. It's a memorandum that suggests this interpretation that costs are not necessary. Does it say the secretary? It doesn't say the secretary at all. It doesn't have a name on it. It doesn't even have any suggestion. It's equivalent to a form of no substance. Let me ask you a question before you go any further. Are you arguing for everybody or are you splitting the time? I am to defer to counsel for the final ten minutes of Mr. Carman and Mr. Friedman, and Mr. Bookman will address any issues that have to do with it. I don't know how many minutes that is. You want to go down to ten minutes? Is that the point? Yes. Okay. I just wanted to check before. Sometimes people get a little antsy over there. I understand. And I understand. And I think this is a critical point. This is not an authoritative interpretation. In Price, this court said that the form and context in which a pronouncement of an agency is issued is critically important. It must provide for some public input. Did Price deal with this situation with the secretary? Never mind. Congress told the secretary, here's the marching orders, do it. No methodology. And that's no different than what Congress told the Department of Labor in Price and no different than what the Congress told the Department of Treasury. You need public input if you don't have to have a rulemaking. Well, we contend you do have to have a rulemaking. They can't. I don't know any case that would take that position. What would be your best case for that? All right. The best case, we're not suggesting that you cannot make an authoritative pronouncement through adjudication. Is there a case that says you have to have a rulemaking? Because that's what you just said. I'm sorry. I meant to say, and this is why I need to back up and consider Alaska because that's a key decision. Let's just start with this. So there's no case that says you have to have a rulemaking. You just think it would be prudent. It would be prudent in this instance if they are going to contradict the positions they've taken in prior instances, including Alaska, including the position they took in Price. But they seem to say sometimes costs yes and sometimes costs no. So why doesn't Alaska congruent with that? The only part of Alaska that we think is distinguishable is that under Price, it should not be extended to an informal adjudication. There was no process that allowed the public to participate. You submit material, but we don't know what we're submitting against. But how can we, I guess the other question is we're back to us being this panel of three, and we have Alaska which says, well, we looked at this whole process where it's delegated to the secretary and we give deference. How can this panel now say, well, we don't give deference? Because it's an informal adjudication that has none of the trappings of fairness that the Alaska court talked about for two pages. It suggested that the opportunity for the public to participate through intervention, the ability to brief, most importantly, the ability to get an explanation of the decision. Here, this panel. Can a California doctor refuse Medicaid patients? Yes. And most of them do. In fact, 95 percent, let me invert it. Five percent of the doctors treat the majority of the patients in California. So nothing is being taken from an individual doctor if Medicaid makes it impractical to participate? If they elect not to participate. Congressional mandate to make services available enough. Nothing is taken in the sense that they do have the election to not participate, which most of them do. When you say doctors, you're including ER docs and hospitals? That's what produced orthopedic. In orthopedic, the doctors and the emergency rooms were obligated to treat those patients. In hospitals, it's a little different. They get a monopoly and protection against competitors. In exchange, they get a whole lot of rules imposed on them that basically require them to distribute services to other people. That is the exception. They don't have that election. That's, as you said, a different context. But in most instances, they do have the election. You know, I keep thinking of this in terms of appointing counsel. There's a constitutional right to counsel if you're charged with a crime. There's no constitutional right to medical care if you're sick. Yet current Supreme Court law is that a state can appoint counsel and require them to serve without compensation. So at least constitutionally, I wouldn't see any problem under current law, even though it doesn't sound very nice for both the state of California and the federal government to say nothing, nothing for poor people to get medical care. Instead, Congress has provided that poor people do get medical care, but under a very, very loose interpretation requiring a lot of judgment by the secretary. That judgment must be exercised in a manner to which deference is properly afforded. And this court's en banc decision last month in Chevron, excuse me, in Price, construes me, construes Chevron, and concludes that you do not give deference to a private, non-public decision-making process short of rulemaking of the kinds of protections that rulemaking or formal adjudication provide. Wouldn't that depend on the particular context of the kind of decision it was? Absolutely. And in this instance, there was, as I said, the complete inverse of the process that we had in Alaska. We had to go to court and get a favorable ruling on the Public Records Act just to obtain copies of the state plan and the correspondence. It's a private process. The secretary does not communicate and will not communicate with the provider or beneficiary community. In the formulation of the SPA, does your client have input? Absolutely not. As I said, we had to file a state court Public Records Act just to get copies of the submission. That's how private the process is. But on this proposed rule, there will be public guidance. Absolutely. And the comment is closed on the public rule, right? It is, but we commend the proposed rule for correcting the big deficiencies in the system. I'd like to address the proposed rule very briefly. It corrects that very deficiency, Your Honor, that it requires a public process when the state is seeking to reduce rates. And it requires the state, ironically, given their argument today, to compare the rates to costs or Medicare. They didn't either in this instance. And it's difficult for us to understand how their policy can be claimed to be longstanding and consistent when they're doing just the opposite. They didn't consider costs in this instance. And the comparison to Medicare, which they didn't do, shows that it's about 40% of Medicare. Medicare's aren't the best rates, but 40% of Medicare is extreme, as is being the lowest. Someone has to be the lowest on the totem pole. But it is that kind of private process versus public process that we think is critical in applying Alaska, in applying need, in applying price to whether this ambiguous, unauthored communication in June gets deference. We're aware of no case that has ever overruled prior precedent based on such a flimsy explanation. There is no explanation. That's the key thing missing that Alaska provided in the disapproval. You actually have an idea why they're disagreeing. In your honor, Judge Clankville, you might be very correct. In certain contexts, the secretary might explain why costs are not a very good measure. But they've never done that. In fact, the proposed rule says cost is still very relevant. If they complete that proposed rulemaking, then I do think Brand X applies. Then I think a deferential standard under Chevron applies. And we can evaluate that circumstance when and if it ever occurs. But I just don't see it occurring. And they've given you no commitment to following through on that rulemaking. And they've thrust the court in orthopedic, Alaska, ILC 1, ILC 2, Cal Farm 1, Cal Farm 2, into the role of having to interpret a statute because they have refused to do so. And they can't ask you to defer to a result without an explanation. I don't think price will condone that. I don't think need will condone that. Thank you. Thank you. Go ahead. Go ahead. Excuse me. I'm sorry. I'll try to be really annoyed bookman. I'm here on behalf of the California Hospital Association as part of these consolidated cases. I'm only going to address a couple of quick issues and let other counsel speak. I'm going to focus on the application of the AB-97 cuts to the hospital-based skilled nursing facilities. Whether orthopedic and the requirement that cost studies be reviewed is still, in Your Honor's view, the law. The application of the AB-97 cuts to most of the providers here, including the distinct partners and facilities, must fail because the Secretary's consideration of the A30 standards as reflected in the record was arbitrary and capricious. I know it's a deferential standard, but it's still, under the applicable law, probing, careful. You've got to look hard at that record. You've got to determine whether all of the relevant factors. We have a hard-look rule like in NEPA cases. It's not a hard-look rule. It's probing. The Supreme Court, in case after case, citizens to preserve more. Arbitrary and capricious means the Secretary doesn't have to justify it to us. Instead, somebody challenging the Secretary has to show that the Secretary's determination was arbitrary and capricious. Absolutely, Your Honor. And what standards do you think it's in violation of? First, let me say it this way. You have to be able to look at the record and figure out what the agency did so that you can review. You're not supposed to guess at what they did. You have to be able to look at the record and decide what they did. From this record, we have the October 20th. You have to look at the record and show that it was arbitrary and capricious, rather than us looking at the record to see if it justifies the decision. Right. Let me explain where I was going. If you look at the October 27 determination letters, and they're all the same in all of these cases, they say that we've considered access. They say that. But they don't say that they've considered quality. You can't find in the records any discussion of quality by the Secretary. I don't see how you could really assure quality. I mean, half the doctors are below average and 10% of them are in the bottom 10% in terms of their competence. The statute says the rates, the payments, must be consistent with quality of care. How much quality, though? I mean, is a strictly high quality barely adequate, or is it a really good doctor? It can't be the latter because not that many are. Here's what the record shows with respect to the distinct park nursing facilities. It shows that in rural areas, they are the only source of skilled nursing care for many, many miles. If they go out of business, there is no skilled nursing care, and in some instances if they go out of business, there is no hospital in the community for miles and miles. You shut down the skilled nursing facility, that means patients either don't get care or they have to get transferred hundreds of miles. That's not consistent with quality. Hundreds of miles sounds so short to me. California versus Alaska, Your Honor. What can I tell you? I don't understand. What are you talking about? You started with saying that there was no consideration of the standards. There's no efficiency. You're talking about what's set out in the statute? Correct. What's set out in 38? Wait a second. I think you're really taking huge liberties with this letter because it says, the one that I'm reading, we conducted our review of your submittal with particular attention to the statutory requirements of Section 1902A-30 of the Social Security Act. Doesn't that mean that they paid attention to those requirements? They can't just say you considered something. In fact, we do that all the time. Excuse me, Your Honor. I mean, I think you've really gone overboard when you say they didn't pay any attention to stuff that they said right here that they paid attention to. They didn't parrot the words. They don't have to. They have to show in the record. They don't have to parrot the words. They said we paid particular attention to 30A. Did they? 1902-30? They have to show some discussion of the quality issues that we raised in the record. Why do they have to show nothing? When a district judge issues an order, motion denied, and we review it for abuse of discretion, which is a much more searching review than arbitrary and capricious, we don't say reversed because the judge didn't give reasons. Somebody has to show us that motion denied could not have been made within the broad scope of the district judge's discretion. Because if you look at all of the APA jurisprudence, and we cited it in our briefs, the agency is obligated to explain its course of reasoning. It just can't say we decided to comply with the statute. They have to go through the evidence that was presented to them in the record. You're saying the letter itself is defective. It's deficient. It's arbitrary and capricious. The letter is insufficient, and there's nothing else you can divine from the record. If there was other material in the record where they said, this is what we did, fine. If there was a judgment call and they made it in a way I disagreed with, we lose. But they have to show that they've looked at the evidence. They have to show that they've looked. What about this back and forth with California? Some of them, you know, this isn't right, that's not right, go back and do this, we're concerned about that. Isn't that what we're talking about? And then in the end they say, okay, we got the information, here's our decision. Where we've, they can, that's just, the fact that they've got a colloquy with California doesn't cut it. They have to say, we've, you've submitted evidence showing distinct part nursing facilities that says that. You want a decision that looks more like an administrative decision in an environmental impact statement. Closer. It doesn't have to go that far, Your Honor, but there has to be some way that you can review the record and say, they did a good job. Not that they did the right job, not that you agree with them, but they did a good job. We're going right upstairs if we go your way, because the D.C. Circuit ruled the opposite way in pharmaceutical research. Absolutely not. I read that case. They, the D.C. Circuit decided the Chevron issue in pharma. And they still had that against us. They did not apply the relevant factors test. They did not apply the arbitrary and capricious standard in the way that I'm discussing, right? It's a different thing. First, they decide what the statute means. A simple determination is enough, and it gets Chevron deferred. Pardon me? They said a simple determination is enough, and it gets Chevron deferred. As to the interpretation of what the statute means, not, even if you determine what the statute means, we don't have to consider costs. What that case was about was the secretary had said that, I think it was, I can't remember which political unit's plan was okay. It did, but it wasn't, it was only deciding what the statute meant. It wasn't then applying, confronted with an arbitrary and capricious type of a challenge. Those are different things. You have to first decide what the statute means. That's under Chevron. If we lose that, you still have to decide based on whatever the statute does mean, was it arbitrary and capricious? Did the agency consider the relevant factors? Did the agency provide an explanation? Everyone's going to get an opportunity to make their argument. Was there an explanation in the record? Can you figure out the course of reasoning, what they did, and did they consider the relevant factors? Does somebody in here have an electronic device? Somebody else? Would you please step outside? Please step outside so that we're not disrupting the argument. Please step outside, sir. That's a offender right there. Okay. Let me bring it, again, with the. . . Tell us about them, Dennis. Okay. Then let me go to this one thing really quick. All right. Assuming we went on orthopedics, and you agree that orthopedic is still binding law, counsel said that, well, for distinct part nursing facilities, there was a cost study. The cost study had nothing to do with AB 97. It was a February. . . It was prior. It was February 2009, dealing with a 5% cut. The state itself doesn't even argue it relied on that cost study because it didn't in the AB 97 cuts. For distinct part nursing facilities, the AB 97 cuts are not a 10% cut. They're a 23% to 25% cut because they roll the rates back to August 1, 2008 levels and then cut them 10%. Thank you. One more thing. Did you tell us that pharmaceutical didn't deal with arbitrary and capricious? Yes, I can recall, Your Honor. It says here, having concluded the Secretary's interpretation of permissible, we must next consider whether his specific determination that the initiative serves valid Medicaid goals is arbitrary or capricious. So it did. Okay, but then it didn't apply. . . I apologize, Your Honor, but it didn't apply. . . People just take liberty with these cases. It's unbelievable. If the Court please. . . My associate counsel is here to write out questions if I don't hear them. No problem. But I will say that I've been able to follow the argument so far, so hopefully it can continue that way. I'd like to delight in my argument in about three places. To answer one query from the Court about the format I've come on, why the decision was arbitrary and capricious in respect to pharmacy, and the remainder of my time on the general really important questions that this panel has been asking. Okay. Would you wait just one moment just to be easier now? Why don't you put the clock back at nine? Thank you. All right. On the subject of the arbitration, I'm the attorney in five of those six cases. In six of those cases, I've obtained injunctions in five of those cases, and we've been negotiating for about four months. And I'm here to tell you that the state is just stalling. They're trying to whipsaw your decision against the first panel's decisions because if your decision comes out first, you will more or less precede the old panel's decision. And they don't want the old panel to decide this case first. They want you to decide it. So that's why they're stalling. And that's the answer to that question. The next question is on the subject of arbitrary and capricious in respect to pharmacy. When you say they're stalling, what you mean is the mediation has not succeeded so far. You think it's because they're stalling so that this panel will rule. I'm giving you my opinion, yes. Okay. You think it would have succeeded had there not been the possibility they'd get a favorable decision from this panel? They're shaking the dice. They don't know what this panel is going to do, but they hope to get a better decision from you. That's another set of panels and a better decision. So go ahead. Now, on the issue of whether the decision in respect to pharmacy was arbitrary or capricious, you have to recall that this case is a 10% cut in payments to pharmacies. And they did have a cost study in the administrative record. And guess what that administrative cost study was? It was a 5% payment cut of AB 5, which Judge Schneider had already overruled and the Ninth Circuit Court has sustained has not been sufficient to support a 5% study. So they have the guts to put this into the administrative record for the 10% cut and then try to call that a reasonable decision based on the 5% cut. And then, as to the so-called monitor. I don't see why these costs mean anything. I mean, the way medicine works is pretty much all the costs are up front, and making another pill costs almost nothing. And that means that there's always a lot of room for negotiation, and there always is a lot of negotiation with medical services, say, in the nature of what a doctor provides. The doctor may be making, maybe the doctors who are providing Medicaid patients with services are making $500,000 a year, and the cuts mean that the cost of going to the doctor will not be covered by the Medicaid. But if enough doctors still sign up for availability and make $400,000 a year instead of $500,000 a year, the statutory criterion of availability is satisfied. I don't really see why they have to look at costs. Well, I'm glad John asked that question, because I represent pharmacy. They are not doctors. They are the low man on the skinny pole. They have to take whatever rate is offered by the particular third-party plan. If they don't accept that rate, they're cut out of that whole market. So the history of pharmacy is that they're barely existing on the rates that are being reduced and reduced and reduced. And the 5% study found that even with a 5% rate cut, that the total payment to the pharmacy did not equal the amount of money it cost the pharmacy to acquire and dispense the drugs. I thought that the cost studies came across to the secretary in the first batch of information, and the secretary didn't see any of that as dispositive and sent it back for further determination. Am I wrong about that? Well, they ought to object to all of that, because it's not in our record, in our case. There's none of that correspondence in the administrative record. That's all extra information. Is that what happened? I have no idea, because we were not privy to it. Did anybody tell you that's what happened? We are not the state association, Your Honor. We are a state association of about 340 members, and we have about 300 pharmacy planners. Setting aside who you are and who you aren't, did anybody tell you that's what happened? No, nobody told us anything. So in the case of the pharmacy, we don't have in our record a back and forth as we do in some of the other records. No, there's no letters back and forth in this record in the pharmacy case, in the MPC case. And so anything that the state and the attorney general tell you about the correspondence back and forth is all inadmissible when we object to it. Now, turning to what is in the evidence, the state did put a statement into the record that, oh, they have this wonderful monitoring system, and that's on excerpts of record 66. And it says that we're going to monitor periodically and see whether anything is going wrong. And so for pharmacy, they have on excerpts of record 105, the monitoring system for pharmacy. And it says that it has a number of pharmacy providers who submitted a claim for services during the period of measure. Let me give you a hypothetical. Suppose that the reimbursement to pharmacies approved by the California plan as approved by the secretary meant that every single pharmacy in California would go out of business because with real estate prices what they are and personnel prices what they are in California and labor regulations what they are, you could not do businesses profitably as a pharmacy in California. Nevertheless, every Medicaid patient could get all of the medicines prescribed for them by mail order from mail order pharmaceutical companies elsewhere. Would that violate the statute for the secretary to approve? No, Your Honor. I'm glad you asked that question. One of the plaintiffs, in our case, has a large homebound customer base. And the reason that he gets out of business is because none of the chains will serve people who are homebound. So if... Well, you can get medicines by mail. A lot of people do. What's that? My medical insurance company keeps telling me they want me to mail order my medicines. The basic answer to the question is it's not quality care. Mail order medicine isn't? It's not quality care because you don't have a pharmacy who is there to check your records. Why is that? You can get the same statin drug or whatever it is from a mail order pharmacy as from a local one. It is not quality because the initial prescription comes in and you don't get a personal state law requires a personal consultation between the pharmacist and the patient. If you don't have that, you don't have quality. 98% of those people hit the decline button. Decline by whom? The decline. I declined to consult with the pharmacist. Well, because they see it as not quality medicine. And Congress did not pass a Medicaid Act so that mail order beneficiaries could receive the lowest standard. You know, I agree with you completely in terms of quality medicine, if you mean the best quality. But the statute doesn't seem to require the best quality, and I think that's impossible because 100% of the people would have to go to the 10% of the doctors who are the best 10%, and they'd have to go to the best 10% of the pharmacies, and that's a logical impossibility. Well, what happens in practice, John, rather than in theory, is that when the pharmacist can't get paid what he pays to acquire and to dispense, he doesn't dispense that medicine to Medi-Cal patients. So they don't get the medicine. If it's a brand, they have to go back to the doctor. The doctor has to prescribe some generic that is not as good as the quality medicine that the doctor prescribed. Congress wanted the patient to have quality, not second grade. None of that makes any sense. I mean, the FDA only approves generics if they are as good. And many medicines now are supplied to individuals because they just send their prescription into a mail-order pharmacist. Even high-income individuals. Quality of care is written in the statute that we're talking about, and we have to maintain quality of care. I have your argument in mind, and you've exceeded your time. Thank you. Thank you. We'll give others another one. Okay, so this is the hazard. You should never split your argument like this. It never works. You're out of time. But because you have a client to represent, I'm going to give you four minutes. But I'm just going to tell counsel, which we tell people always, splitting the time never works. You've got to consolidate. We have a shotgun approach here with the different clients. You have extensive briefing here, which we've spent extensive time on. Your time has completely expired, Mr. Carman. I'm going to give him some time now. Same thing happens with the government, with the federal government and the state. Same problem. Thank you very much, Rona. Stanley Friedman on behalf of the CMT, the California Medical Transportation Association. I won't step on my other counsel's arguments, but I'd just like to point out how the state's actions in regard to non-emergency medical transportations, arbitrary capricious, hit some bullet points. And then I'd like to sit down unless the court has questions, obviously. But NEMT is probably the smallest health care provider in the state. It's the most fragile. Unlike other health care providers, it's only had two rate increases since the history of the program, one in 1985 and another in 2000. And I'd like the court to consider the fact that gas prices, vehicle insurance prices, workers' compensation insurance prices have increased significantly since 1985. If there's evidence in the record that the district court considered, then respectfully I'd ask the court to consider that NEMT providers would shut down if there were a 10% rate increase. Do you communicate that in some way, not to the secretary, but to the state when it's trying to organize its plan and its plan amendments? Well, Your Honor, there's in the record, and actually the client's here, but the president of the CMTA, the executive officer, has written several times to Toby Douglas asking to meet with him in terms of a presentation of how CMTA works, how NEMT works. So CMTA is an organization. I'm sorry, yes, Your Honor. CMTA is an organization. Yes, Your Honor. How many members of the organization are there? About 80. How many were there in 1985? I don't know in terms of the organization. It doesn't represent all the providers in the state. Offhand or not, I don't remember how many there were. Have providers disappeared since 1985? Yes, Your Honor. Well, how? Show me. Where's that in the record? That is at Excerpts of Record 237 and 416. What does that show? It's the declaration of an individual who's in both the ambulance and the non-emergency business, and it indicates that providers have shut down significantly in the last few weeks. And even though you didn't have a meeting with Mr. Douglas, is that information, going back to my first question, is that information communicated to the state in connection with its plan amendments? To the extent that they're able to by way of letter, it has been indicated. But I don't know whether it was actually considered, because the actual study or the information that was submitted to the federal government seems to be contrary to how the industry works. So, for example, in the years 2008, 2009, 2010, the state gave the number of emergency vehicle companies, ambulance companies, to the state and gave the number of NEMT, which is a very significantly different business, and they're identical. And what came out during the record is that the state said, well, emergency vehicles, ambulances, can provide non-emergency transportation services, which is contrary to the record. So, for example, the minimum reimbursement rate for an emergency vehicle is $111. The minimum reimbursement rate for an NEMT is $18.97. So nobody's going to want to provide an $18.97 ride for 1,100. Kind of like CJA reimbursement rates used to be. Yes, Your Honor. Yes, Your Honor. I barely take a cab for that. So let me ask a practical question, and if it's not in your bailiwick memo, I can ask the state. But right now there's an injunction in place. So these cuts haven't gone in place, correct? Correct, except for about a one- or two-week time period for my industry. But by and large? Yes, Your Honor. So if the injunction were listed, is there some administrative procedure whereby money would have to be paid back by individual providers, or is it water under the bridge? It goes both ways, Your Honor. I think if we were to lose, there's a retroactive effect back to June 1, 2011. You think, or there is? Well, there is, Your Honor. I posit that there would be. They would seek reimbursement, which would destroy this industry that's only had two rate increases since 1911. Is that in a rule or regulation of law, Statute 11? Where does it say that? I think that's in the CMS approval of October 27, 2011, where they said it's approved effective June 1, 2011. And the state intended to, and actually did in my industry for about two pay periods, seek reimbursement from. So let me ask you, and one of the other counsels said, well, we think you should wait for the regulation to come out, if it's going to come out. But that's rolling the dice, too, isn't it? Because if the regulation comes out and it says whatever it says, either proposed or modified, then you might have a bigger bill with the bank, so to speak, to pay back, right? Yes, Your Honor, exactly. Do you have a position on waiting vis-a-vis your clients? Your Honor, given the NEMT, I think we should get a decision now because it would be devastating to providers. The margin is so thin that if they are providing services now and may have to provide reimbursement going back a year or two, it will just devastate the providers. Okay. Well, I actually gave you a little more time than I said. That's fine. I appreciate your patience. Thank you so much, Your Honor. Thank you. And thank you to the panel. Three minutes for rebuttal. And that includes the state. Thank you, Your Honor. To address a couple of the issues that have come up, this panel can decide both the question about what Section 38 means and the cause of action question, notwithstanding the decisions, other panel decisions that have come before, as has been discussed, but also just to clarify, in the approval letters themselves, CMS was entirely clear about its interpretation of the statute. It said the state was able to provide metrics which adequately demonstrated access, and then it listed what those metrics were. That's entirely clear with respect to CMS's understanding of what Section 38 requires. So what document do you think we would look to to figure out if they considered all these things besides the letter, which is pretty opaque? The letter is succinct, Your Honor, but it does say that it considered the Section 38 factors. Basically, it's a one-page letter. It says we considered everything approved. Well, and including on the argument they make is we have no idea what the underlying rationale, how could we determine if it's arbitrary and capricious when all they do is say stamps approved. With respect to the statutory interpretation, it's clear from the discussion of what metrics were considered and found sufficient how the Secretary is construing the statute, and that's also corroborated. How would we figure out, for example, let's just take the last case for this non-emergency transportation where it shows there's not very many rate increases, that there's this huge gap. How do we know that that is appropriately accounted for in the government's approval of the state plan on that? So we have the administrative record, and the Secretary has asserted that she considered all the materials. No, but he keeps saying that that's what she said, but that's just a band-aid, a conclusory. I considered everything, and here's my decision. Is there any record we'd look to to see whether, in fact, let's say on the CMCA claims, whether, in fact, the decision was arbitrary and capricious based on information? The Secretary requested from the state access analyses providing a picture of the market for services, and you can find that study at the CMCA access of records 68 to 69, and what it actually shows, contrary to plaintiff's contention, is a very robust market. Even while beneficiary enrollment was increasing substantially during the recessionary period that was the subject of the study, the beneficiary utilization of services was itself increasing. So you have a market where supply is abundantly able to keep pace with demand, and that's the type of study that the Secretary asked the state for and that the state provided, and there's been no doubt cast on those figures. With respect to CMCA in particular, it is also worth noting, we note in our brief, that this is a Medicaid-only service, so if the question is comparative access, it's not a service used by the rest of the population. So the Section 30A analysis doesn't actually exist. It exists only because there's Medicaid reimbursement available. Yes, and Medicaid does require separate provisions that say you shall provide such transportation, and the Secretary was making sure that the service here was consistent with that requirement, but it's not a Section 30A comparative access question with respect to this service. Very briefly, if I may, on the question of whether there's a cause of action against the state here, even if this court does feel bound by ILC1, which I would submit has been called into doubt by Douglas, this is a different case because of the existence here of federal agency action, and that's exactly what the majority in Douglas signaled when it remanded in that case, and it just doesn't make sense, I think, at a very basic level to talk about preemption, which is what we're talking about under the Supremacy Clause in a case as here, where the federal agency charged with construing the federal statute has said state law is consistent to be bringing a claim based on the inconsistency of the state and federal law as preempted. Counsel, help me with a different thing. In the letter of determination, the Secretary in the penultimate paragraph said, In light of the data CMS reviewed, the monitoring plan, and our consideration of stakeholder input, we have determined that the above-mentioned amendment complies with Section 1902A, 30A of the Act. What does that reference to stakeholder input mean? What input was there? Are you referring to a particular case? I missed that part. As I said, the Secretary's letter of determination, I'm looking at HHS 1575. Yes, Your Honor. So the stakeholder input is the contact with providers, the receipt of their submissions, letters from providers and beneficiaries. The providers have told us an argument that they didn't get a chance to be heard, and that's why I asked you about this. I was wondering, what was the process for obtaining stakeholder input? Your Honor, it did vary by case. The CMA has the most robust stakeholder participation, but the State is itself required to give notice when it initiates a plan amendment, and so providers are put on notice at that point, and they then know to contact the State and to contact CMS if there are issues. The thing is that before the Secretary approved the State's plan, the State gave notice to providers and gave them an opportunity to be heard? And the Secretary then considered that input? Yes. The stakeholders went, in many cases, to CMS. There were actually several meetings between. It's become popular for people to talk about stakeholders in certain areas of law. That means the providers? Generally the providers. There was some input in the record from beneficiaries as well, but for the most part we're talking about providers. Basically sellers of medical goods and services? Yes, Your Honor. And they submitted studies, letters, and in several instances actually met with CMS officials to discuss their concerns. And CMS in turn went back to the State and requested additional information where it had doubts about what effects the payment rate reductions would have. Thank you. The case just argued is submitted. The managed pharmacy care versus Sedalia. Thank you, all counsel, for your very comprehensive arguments. We're adjourned for the morning.
judges: Trott, Kleinfeld, McKeown